WILLIAM P. KINIRY *v*. ANTHONY J. DEGUTIS ET AL.

SUPERIOR COURT      HARTFORD COUNTY      FILE No. 84623
AT NEW BRITAIN

Memorandum filed January 22, 1953.

*Leo V. Gaffney*, of New Britain, for the Plaintiff.

*Ericson, Politis & Gleason,* of New Britain, for the Defendants.

MOLLOY, J. The plaintiff is, and has been for many years, engaged in the practice of accountancy. The defendant, Anthony J. Degutis, operates a pinball machine and jukebox business; that is, he owns the machines which are placed in such places as taverns, clubs, grills and restaurants where they are put in operation by patrons and the proceeds divided between the owner of the place of business and the owner of the machines. The wife of Degutis is named as party defendant because she made joint income tax returns with him and this whole affair concerns these tax returns.

According to the plaintiff's bill of particulars, his claim is "For services rendered for Anthony J. Degutis, Taxpayer, in regard to the Intelligence Unit Treasury Department investigation—Mr. Ned

Dwyer and Neil Begley, Agents—said investigation being from September 25, 1948 to January 6, 1949. The above period of time involved settlement of the Income Tax Returns for the Years of 1942, 1943, 1944, 1945, 1946 and 1947. The tax liabilities for the years of 1942, 1943, 1944 and 1945 were left unchanged, by agreement, with no imposition of negligence or fraud penalty. Deficiency liabilities for the Years 1946 and 1947, were closed by agreement, with imposition of negligence penalty instead of fraud. . . . $7500.00."

In other words, the plaintiff feels that the services, as accountant, which he rendered Degutis, who was being investigated by the intelligence unit treasury department, are worth $7500, and he offers his expert, William B. Carroll, a certified public accountant and attorney at law, to support his position. The defendant Degutis says, through his experts, both certified public accountants, Stanley Cichowski and Louis Goodman, that the services rendered by the plaintiff were worth $300, as estimated by Cichowski, to $500, as figured by Goodman.

Degutis also pleads in defense that the plaintiff had no legal right or standing before the intelligence unit, treasury department, in matters involving fraud and so any services he performed as regards the fraud charge by the government, before that unit, were "null and void" and based on an illegal contract and so not the basis for a recovery against him.

The court deems it not necessary to attempt an analysis of all the evidence in this rather lengthy trial, as trials go, in order to support the conclusion it has reached. In addition, the issues are not too involved and the questions are clear and definite. Did the plaintiff practice law in handling the case as he did? If he did not, but, on the contrary, confined himself to accountancy alone, then did he give

the time he says he did to working out a solution for Degutis to the situation Degutis found himself in with the intelligence unit of the treasury department; was that time necessary; and finally, were Kiniry's services worth $7500? Let the court say in the beginning that, assuming he had the right to represent the defendants under the circumstances, and practiced accountancy alone, his services are not proven, on the evidence, to be worth $7500. This may be one of those cases which an accountant gets "once in a blue moon," as the plaintiff described it, but that occurrence or happening is no justification for "laying it on," either by tradition in the accountancy profession, as this court has understood that precise and difficult work; by the nature and extent of the work done in this case; or by reason of the fact that the taxpayer, Degutis, found himself under investigation by the intelligence unit of the treasury department.

In the latter part of September, 1948, about twenty customers of Degutis received letters from Edwin F. Dwyer, special agent, intelligence unit, treasury department, informing them that in connection with an income tax investigation being conducted by that office they were requested to advise his office the amount of commission received by them from pinball machines, music players, and other gaming and vending machines installed in their places of business by Anthony J. Degutis, d.b.a. Dursell Novelty Co. It developed that the recipients of these letters were clients of the plaintiff, with the result that they promptly brought the letters to the plaintiff for his advice, because he had done their accounting work. Thereupon the plaintiff contacted Degutis and from this contact, after the latter was duly appraised of the serious nature of the situation by the plaintiff, the latter was engaged to handle the case. Kiniry says he informed Degutis that good fees usually resulted to an accountant for handling such cases,

but that they did not agree upon any set basis of compensation for his work. This conference occurred on September 24, 1948. Kiniry asked Degutis for all his records. On September 28, 1948, Mr. Dwyer and another special agent called on Kiniry about the case and asked if Kiniry had the "green card" which would entitle him to practice before the treasury department. He did not have any. In any event the agents told Kiniry to co-operate with them in the investigation and so produce for them all the records Degutis had relating to the matter for the years 1942-1947, inclusive. Finally, after examination of all the records which Degutis had produced and after compiling certain accountancy results and conclusions regarding the status of Degutis with the treasury department, Kiniry turned over all the records he had to the treasury agents on about November 16, 1948. Again on November 26, 1948, Kiniry had another conference with the agents at his office, regarding the situation; again on December 13, 1948, when the agents informed Kiniry they were dropping the individual accounts as they were accepting Kiniry's figures.

On December 16, 1948, Degutis informed Kiniry that his accountant had returned to town and asked him to withdraw from the case, but upon informing Degutis that a point had been reached in the investigation where the whole matter could be adjusted, Kiniry was authorized to continue. On December 21, 1948, the agents again conferred with Kiniry and on the 22nd he reported the results to Degutis. On December 29 Degutis and the agents met with Kiniry at his office where agent Dwyer asked Degutis if he agreed to the terms of the adjustment, which he did. On January 3, 1949, Kiniry went to the office of the agents in Hartford where further discussions were had when final figures were arrived at and a negligence penalty was agreed upon rather than a fraud

penalty, which would be very much heavier than a negligence penalty. A good part of the evidence concerns a maze of figures which need not be gone into in detail; suffice to say the plaintiff says he spent sixty-six days working on the defendants' case, culminating on January 6, 1949, when he and Degutis again went to the agents' office in Hartford when the terms and figures of the final settlement were gone over and agreed upon. Subsequently Degutis hired another accountant who finally disposed of the matter with the treasury agents.

The defendants base their claim that the plaintiff had no legal right to handle this tax case and was, in truth, practicing law in what he did, on two decisions, which are very informative on the matter of an accountant doing his work strictly as an accountant and not, in the so doing, advising clients on the legal aspects of problems which often confront the accountant, as incident to his work. These cases are *Matter of New York County Lawyers Assn.* (Bercu), 273 App. Div. (N.Y.) 524, and *Gardner* v. *Conway*, 234 Minn. 468. This court adopts certain parts of the first decision, rather than using its own language, as splendidly setting out the true relationship between the accountant and the lawyer on the question of when the accountant may not pass upon legal questions in the performance of his work. These decisions may well be true guides to accountants on what is not a simple question. Of course, every instance where such a question arises is governed by the facts of that particular case. But these cases lay down general principles which can be made applicable and controlling in all cases.

In the New York case the court said (p. 532) in the course of a long decision: "The accountant serves in setting up or auditing books, or advising with respect to the keeping of books and records, the making of entries therein and the handling of trans-

actions for tax purposes and the preparation of tax returns. Naturally his work and advice must take cognizance of the law and conform with the law, particularly the tax law. The application of legal knowledge in such work, however, is only incidental to the accounting functions. It is not expected or permitted of the accountant, despite his knowledge or use of the law, to give legal advice which is unconnected with accounting work. . . .

"An accountant may know more about the tax law than some law practitioners, just as a labor relations adviser, trust officer or customs broker may know more about the law relating to their business than many lawyers not specialists in the law relating to such business. A layman may know a lot of law about a particular subject, upon the knowledge of which he may rely at his own risk in his own business. He may not, however, set himself up as a public consultant on the law of his specialty. If the services of a specialist in some particular branch of the law are required, the public must still turn to the bar, for all the reasons of public protection for which the bar and bar standards are maintained. The law specialist offers more and much more is required of him for admission to practice than knowledge of his specialty. He must have a grounding in the law . . . and attain and maintain standards which are imposed by the Bench and Bar for the protection of the public. . . .

"A thorough knowledge and understanding of basic legal concepts, legal processes and the interrelation of the law in its parts are quite essential to the practice of law in any of its branches. Technicians are needed to serve in bureaus and agencies and in numerous nonlegal capacities, but the counsellor licensed and trusted to advise the public with respect to the law must be a duly qualified and admitted lawyer. We are unable, therefore, to regard

the admission of accountants, subject to certain qualifications and regulations of the Treasury Department and the Tax Court, to practice before those agencies, as an authorization to accountants to practice tax law at large or as an eradication of the distinction between the lawyer's and the accountant's function in the tax field.

"It is much too narrow a view, and one revealing inadequate perception, to regard the tax law as mainly a matter of accounting. More than most specialties in the law, tax law is drawn from and involved with many branches of law. It bridges and is intimately connected, for example, with corporation law, partnership law, property law, the law of sales, trusts and frequently constitutional law. Quite obviously, one trained only in accounting, regardless of specific tax knowledge, does not have the orientation even in tax law to qualify as a tax lawyer. Equally obviously, as a matter of administration, he may not practice any phase of tax law, regardless of what might be his subjective qualifications for the particular undertaking. Inquiry cannot be made in each case as to whether the particular accountant or accounts generally are sufficiently familiar with the law on a particular tax question to be qualified to answer it. An objective line must be drawn, and the point at which it must be drawn, at very least, is where the accountant or nonlawyer undertakes to pass upon a legal question apart from the regular pursuit of his calling. . . .

"May the accountant then handle any tax problem and as a 'tax consultant' entertain any tax question? Respondent appreciates his involvement and though denying taxation as law recognizes that frequently taxation is involved with law. Seeking to square his position with that fact and to allow for it, respondent states that not included in 'income tax advice' by accountants is advice as to collateral questions of

general law upon which tax liability may on occasions depend, such as domicile or the validity of a marriage, which questions may be conceded to lie within the exclusive competence of the lawyer. The concession is only a nod at reality, not a full facing of the fact. Taxation, which permeates almost every phase of modern life, is so inextricably interwoven with nearly every branch of law that one could hardly pick any tax *problem* and say this is a question of pure taxation or pure tax law wholly unconnected with other legal principles, incidents or ramifications.

"This does not mean, of course, that many or most questions which may arise in preparing a tax return may not be answered by an accountant handling such work. But if the question is such a problem that an outside consultant, besides the regular accountant preparing the tax return, must be called in to do legal research of the kind which was necessary in this case and to advise as to the none too clear, if not obscure law, that consultant must be a lawyer.

"Respondent is most persuasive when he challenges the consistency of recognizing an accountant's right to prepare income tax returns while denying him the right to give income tax advice. As respondent says, precisely the same question may at one time arise during the preparation of an income tax return and at another time serve as the subject of a request for advice by a client. The difference is that in the one case the accountant is dealing with a question of law which is only incidental to preparing a tax return and in the other case he is addressing himself to a question of law alone.

"The preparation of an income tax return is not primarily a matter of law and generally and mainly is not a matter of law. It may usually be prepared by one having no legal knowledge, from in-

structions prepared for lay consumption, or by one having only incidental legal knowledge. A taxpayer should not be required, therefore, and is not required, to go to a lawyer to have a tax return prepared. It is a practical, reasonable and proper accommodation to business men and the accounting profession not only to permit accountants to prepare tax returns but to permit them, despite the risks involved, to assume jurisdiction of the incidental legal questions that may arise in connection with preparing tax returns. It is quite another thing to say that apart from preparing a tax return and from doing the accounting work in connection with the return, an accountant should be permitted as an independent consultant to pass upon specific questions which are questions of law, especially when the occasion for such consultation is apt to be, as it was in this case, a particularly knotty question of law. The distinction is altogether valid and desirable. The law here, as elsewhere, is a rational and practical adjustment of conflicting interests, objectively calculated to be of the greatest public benefit.

"Respondent, therefore properly, makes an appeal of public interest, under the heading: 'The public would be materially inconvenienced if accountants were ousted from the income tax field.' His brief states that a decision adverse to respondent would prevent accountants from continuing to act as advisers in the income tax field and would give the legal profession a monopoly in this field. The consequent inconvenience to the public is illustrated with the observation that larger corporate taxpayers can afford to retain both lawyers and accountants on a regular basis, but that it would be unreasonable to expect the average small taxpayer to do so or to bear the expense of a lawyer's education in tax accounting and administration. The argument bears analysis.

"We have heard no proposal that accountants be ousted from the income tax field. It is precisely out of consideration of the interests which respondent emphasizes, that a taxpayer may, if he wishes, leave the entire preparation of the tax return to his accountant, legal incidents included, without the necessity of engaging a lawyer. It may and probably will remain true, as respondent quotes the American Bar Association as noting, that the bulk of income tax work is not handled by lawyers. When, however, a taxpayer is confronted with a tax question so involved and difficult that it must go beyond its regular accountant and seek outside tax law advice, the considerations of convenience and economy in favor of letting its accountant handle the matter no longer apply, and considerations of public protection require that such advice be sought from a qualified lawyer. At that point, at least, the line must be drawn. The line does not impinge upon any of the business or public interests which respondent cites or oust the accountant from the tax field or prejudice him in any way in the pursuit of his profession or create any monopoly in the tax field in favor of the legal profession. It allows the accountant maximum freedom of action within the field which might be called 'tax accounting' and is the minimum of control necessary to give the public protection when it seeks advice as to tax law."

This rather lengthy quotation would seem justified for the light it throws on the situation in the instant case.

In similar tenor is the language of the *Gardner* case. Both cases were instituted by committees of the bar for the purpose of determining the question of how far a layman, as an accountant, may hold himself out as a tax consultant or tax expert, which may imply that he has knowledge of the law, for the practice of which a lawyer is licensed by the

state. In both cases legal questions were definitely asked and answers, just as definitely, given by the respondents. The courts held that they were practicing law.

The respondents lean heavily on this claim in the instant case; that the case was full of legal questions which needed answering before Kiniry could do justice to Degutis; for after all he had the intelligence unit of the treasury department after him. That, for instance, he voluntarily surrendered the business records of Degutis to the agents, rather than making them subpoena them, which needed legal advice before being acted upon. And so, other instances are referred to as requiring legal advice. The court does not take this view of Kiniry's handling of the case. It does feel that the first thing he should have told Degutis was to go get a lawyer. If nothing more, this would have lessened Kiniry's responsibility, inasmuch as his task would be confined to problems of accountancy alone, which would be serious enough in themselves. But Kiniry started out with the idea that he could examine the records of Degutis and determine where he stood with the treasury and if Degutis was wrong on his returns or was in trouble with the authorities, he would compromise the amount of taxes due and thus do a good job for him and so get a good fee. This matter was not as simple as all that; and while no harm came of it, in all probability, of course, he should have had legal advice before he handed over, voluntarily, the records of Degutis to the treasury agents, merely on their demand. They asked co-operation and Kiniry was prepared to, and did give it. That was his thought, and in some respects, it was commendable, but not in keeping with the present-day tendency, when challenged by the government in any respect, of admitting nothing and defiantly demanding proof.

No, Kiniry did not practice law as claimed. He simply did the best he knew how, but that does not make his services worth $7500. The defendants' true claim, in this respect, should be, not that Kiniry practiced law, but rather that his services, by reason of his failure to secure legal advice, or have his client get it, are not worth what he now claims. The contention that Kiniry practiced law, and thus must get nothing, must fail.

We come now to the question of what the true value of Kiniry's services is. Aside from the aspect of this case just discussed, the trouble with Kiniry's claim is the real difficulty of determining just how much time he did spend on the case. His main reliance is on his memory; the business records which he should have to warrant any court finding for him in any such amount as he claims are not in existence; they never did exist. He did attempt, from what little notes or memoranda he had, to adjudge the time he must have spent; and surely in the case of the examination of the checks, that was unreasonable. But, that Kiniry did some considerable work and that he worked hard, considering his lights, on the issue presented by Degutis' difficulty must be admitted. But in this respect there is the question of whether or not Degutis might not have had to pay much less taxes than he did. In fact, his other accountant did get a reduction, and claimed that there should have been further deductions, if the case had been handled differently. It is difficult to determine just how sound this latter claim is, for none of the treasury agents testified; nor did Degutis, for that matter. It is always easy to criticize the other fellow's work, or to depreciate it. We must always try to be fair and just in appraising his work and setting a value upon it. All factors must be considered. The court has tried to do this in this case. The plaintiff cannot expect, on this record, to receive what he claims here.

Judgment may enter for the plaintiff to recover of the defendants the reasonable value of his services, namely, $1500.